2006-NMCA-071

137 P.3d 645

**STATE of New Mexico,
Plaintiff–Appellee.**

v.

**Andrew WALTERS, Sr., a/k/a Andy
Walters, Sr., Defendant–
Appellant,**

and

**State of New Mexico, Plaintiff–Appellee,**

v.

**Stephanie Lopez, Defendant–Appellant,**

and

**State of New Mexico, Plaintiff–Appellee,**

v.

**Steven Lopez, Defendant–Appellant.**

**Nos. 24,585, 24,566, 25,110.**

Court of Appeals of New Mexico.

April 27, 2006.

Certiorari Granted, No. 24,585,
No. 29,806, June 14, 2006.

Certiorari Granted, No. 25,110,
No. 29,801, June 14, 2006.

Certiorari Granted, No. 24,556,
No. 29,803, June 15, 2006.

As Corrected June 21 and June 29, 2006.

Patricia A. Madrid, Attorney General, Santa Fe, NM, Joel Jacobsen, Assistant Attorney General, Albuquerque, NM, for Appellee.

The Law Offices of Nancy L. Simmons, P.C., Nancy L. Simmons, Albuquerque, NM, for Appellant Walters.

Liane E. Kerr, Albuquerque, NM, for Appellant Stephanie Lopez.

Law Office of J.B. Jacks, Jack Bennett Jacks, Albuquerque, NM, for Appellant Steven Lopez.

## OPINION

VIGIL, Judge.

{1} The dispositive issue in this case is whether Defendants were denied their constitutional rights of confrontation and cross-examination under the Sixth Amendment to the United States Constitution at their joint jury trial when interlocking confessions or statements of each Defendant were admitted into evidence and none of them testified. We determine that *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), were violated and require the convictions to be reversed because the error in admitting the interlocking confessions or statements was not harmless beyond a reasonable doubt. We therefore remand the cases with instructions to grant each Defendant a separate trial.

## INTRODUCTION

{2} This case involves the convictions of Stephanie Lopez (Mother), Andrew Walters (Father), and Steven Lopez (Uncle) following a jury trial for the abuse resulting in the death and sexual assault of five-month-old Baby. Mother was convicted of negligently permitting child abuse resulting in death or great bodily harm, and negligently permitting child abuse not resulting in death or great bodily harm. NMSA 1978, § 30–6–1(D) (2005). Father was convicted of intentional child abuse resulting in death or great bodily harm, conspiracy to commit intentional child abuse resulting in death or great bodily harm, criminal sexual penetration of a child under thirteen years of age in the first degree, intentional child abuse not resulting in death or great bodily harm, and negligently permitting child abuse not resulting in death or great bodily harm. Section 30–6–1(D); NMSA 1978, § 30–28–2 (1979); NMSA 1978, § 30–9–11(A), (C) (2003). Uncle was convicted of intentional child abuse resulting in death or great bodily harm, conspiracy to commit intentional child abuse resulting in death or great bodily harm, and criminal sexual penetration of a child under thirteen in the first degree. Section 30–6–1(D); Section 30–28–2; Section 30–9–11(A), (C). Grandmother and a second uncle were also convicted of various offenses, but they did not appeal. Mother, Father, and Uncle appeal.

## BACKGROUND

{3} Baby lived in a bedroom with Mother, Father, and her 18–month–old brother in a mobile home owned by Baby's grandmother and grandmother's partner. Some weeks before Baby's death, Mother's twin brother (Uncle) moved into the bedroom. Mother, Father, and Baby's brother shared a futon in the bedroom. When Baby did not sleep in her bounce chair in the room, she also shared the futon. Uncle slept on the floor. Father's brother (second uncle) sometimes visited Baby's family in the room.

{4} On July 19, 2002, Baby was taken to the emergency room where she died. The cause of death was cranial cerebral injuries

due to the fact that she was a battered baby. She had bruising all over her head and ears and human bite marks on her face, neck, and body. A blunt force injury to Baby's head in the last three days or less resulted in a large subdural hematoma on her brain. X-rays revealed Baby's skull was fractured in two places, on two different bones, and that the fractures were 5–7 days old. Old blood was found during brain tissue examination, which meant that Baby had received a separate brain injury in the past. Baby's optical nerves were filled with both fresh and old blood, which meant that she had been violently shaken on at least two occasions. X-rays of Baby's torso revealed two broken ribs that were broken several weeks before her death. Baby also had recent bucket-handle fractures of her thighs and one of her arms. This type of fracture results from the limbs being forcefully twisted or yanked causing the growth plate to be separated from the bone, thus resembling the profile of a bucket handle being lifted from its horizontal position.

{5} In addition, Baby's anus and vagina were both injured. Baby had a significant abrasion on her buttocks which went all the way into the buttocks which was consistent with sexual assault. Immediately after Baby was pronounced dead, a nurse observed that her anus gaped open with no muscle tone. At autopsy, the anal opening was dilated to a full inch. Internal examination showed an injury a half-inch to an inch inside the anal opening and vaginal injuries inside the labia minora, including three small injuries to the hymen.

## THE STATEMENTS

{6} On July 19, 2002, around 10 a.m., Mother called 911 and reported that her baby was not breathing as a result of a fall around 3 a.m. The dispatcher overheard conversations between Mother and grandmother when the call was made. Baby was taken to the hospital and was pronounced dead at 11:10 a.m. At the hospital, Mother had conversations with a nurse, a social worker with the Children, Youth, and Families Department, and a Senior Field Medical Investigator for the Office of the Medical Investigator concerning Baby. Father also had conversations concerning Baby at the hospital with the same social worker and investigator. Mother, Father, Uncle, and Baby's second uncle were interviewed later that day at the Doña Ana County Sheriff's Department.

### A. Mother's Statements

{7} Investigator Mark Perea of the Doña Ana County Sheriff's Department interviewed Mother. She told him that a few days before July 19, Uncle had thrown Baby up into the air and Baby had come down. Father had also thrown Baby up, and when he did so, Baby hit her head on the ceiling. She also said that Father dropped Baby while throwing her. Mother said she told Father two or three times to stop throwing Baby. Mother told Officer Perea that the night before, she had a few beers before falling asleep. Father and Baby's two uncles stayed up in the room. When she awoke around 9:45 a.m., Baby was bruised, pale, and not breathing. When she asked Father what had happened, he told her that Uncle had thrown Baby up into the air, and that he found Baby on the floor at 7 a.m. and put her back in her bouncy. Mother also said she saw Father throw Baby as well. They took Baby into the living room and Father started CPR while Mother called grandmother. After calling grandmother, Mother called 911. When Officer Perea asked Mother about the bruises on Baby's ears and bite marks on her body, she said the bruises may have been caused by the way Baby slept in her bouncy and that Baby's 18–month–old brother had bitten Baby in the past.

### B. Father's Statements

{8} Father was interviewed by Officer Lindell Wright of the Doña Ana County Sheriff's Department, and they were later joined by Sergeant Ed Miranda. Father was transported from the hospital to the police station at 11:49 a.m. An officer drove him because he needed a ride. The interview took place in a room with the door closed because of the noise in the hallway, and Father was not given warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before the interview started. However, Officer Wright told Father he was

free to stop talking and leave at any time. Father gave no indication he wanted to leave and was very cooperative. The first part of the interview lasted from about 4:25 p.m. until 5:15 p.m. In the first part of the interview, Father recounted his activities from the previous night. He said he got off work at 5 p.m. and arrived home around 6 p.m. Sometime around 8 p.m., he picked up Uncle at work and they purchased a case of beer. They returned to their house and spent the rest of the night in their room with Mother, Baby, and Baby's brother. He said he went to sleep between 12:30 and 1 a.m., and checked Baby around 3 a.m. He then got up, played with Baby, and gave her a baby blanket as the sun was coming up, and changed Baby's diaper around 7 a.m. He and Mother discovered that Baby was not breathing around 10 a.m., and the 911 call was made. In this part of the interview, Father admitted only that Baby had fallen off her bed during the night and that he caused two bite marks on her ribs, after he initially claimed that his 18–month–old son made the bite marks. At 5:15 p.m., Father was given a 30–40 minute break for food and a soda.

{9} After the break, Officer Wright told Father that Baby was dead, and Father broke down. Sergeant Miranda had interviewed the 911 dispatcher and hospital personnel, had taken photographs of Baby, and then joined the interview. Officer Wright decided to give Father *Miranda* warnings at this time because the detectives had gathered evidence that was inconsistent with his statement. Father was told he was still free to go, and no threats or promises were made to Father to induce him to continue the interview. Father carefully read and signed the sheet acknowledging receipt of his *Miranda* warnings before proceeding with the interview.

{10} After receiving the *Miranda* warnings Father admitted to throwing Baby into the air with Baby hitting her head on the ceiling four days before she died. Father admitted bruising Baby. "I didn't mean for it to leave a bruise like that. Like I left her a bruise like that before, just from messing with her. [Mother] gets mad." He subsequently admitted that the night before, he

and Uncle were "playing a little rough" with Baby by throwing her into the air, with Baby hitting the ceiling, and being dropped onto the floor when he "missed" her. He identified a particular bruise on a photograph as being caused when Baby hit the ceiling and another when she landed on the floor as well as various bite marks he acknowledged he made. Father said Baby hit the ceiling three times and that he also dropped her "two or three times" on the floor. After Baby was dropped onto the floor, "[t]hen we just continued playing the game and then I was messing with her and everyone went to sleep." Father said Baby cried when she was dropped onto the floor, and when he was asked what he did to calm her down, he answered, "I just kept throwing her in the air."

{11} Father was also shown a photograph of Baby's anus, and Father became very upset and profane, saying they were "not going to find any semen." Father said he cleaned Baby's butt with a baby wipe, wrapped the baby wipe around his left index finger, and put the wrapped finger into Baby's anus up to the second knuckle at the middle of his finger. When he took his finger out, "[t]here was a little bit of blood on there."

## C. Uncle's Statements

{12} In the meantime, Investigator Greg Boeglin of the Doña Ana County Sheriff's Department interviewed Baby's Uncle. Uncle at first only said that Mother, Father, and he (together with Baby) were in the room playing video games when Baby's second uncle and a friend came in and joined them for some beers. After watching a movie and drinking beers, he went to bed at 2 a.m. He initially said he drank six beers, then later said it was ten. Nothing was wrong with Baby when he went to bed. When he awoke the next morning, he saw Baby, and did not notice anything. He then repeated he did not see any bite marks or anything wrong with Baby other than a little pink mark on her forehead. Finally, after Investigator Boeglin was informed about other interviews, including the one with Father, he asked Uncle whether he ever threw Baby up into the

air. Uncle answered, "[s]ometimes we would[,]" and he acknowledged that Baby had hit her head while being thrown. Uncle was asked if anyone threw Baby into the air the previous night, and he first answered, "[n]o, I don't think so[,]" then changed to, "I don't remember if I did." On another occasion, Uncle said that he "was throwing her in the air," but answered "I don't think so" when Investigator Boeglin asked him if she was injured.

{13} Sergeant Edward Miranda decided to continue interviewing Uncle himself rather than trying to tell Investigator Boeglin everything he had just learned from Father's interview. Sergeant Miranda asked Father to speak to Uncle before he started Uncle's interview. Father agreed and told Uncle, "[g]o ahead and tell them the truth" and left. Ultimately, Uncle confessed that he joined Father in throwing Baby in the air, hitting her head on the ceiling, and dropping her on the floor. When Sergeant Miranda used the term "physical abuse," Uncle became offended and said, "We didn't physically abuse her. We were just playing with her." Sergeant Miranda said: "Okay. So to make sure, what you're telling me is you and [Father] were playing with [Baby] by throwing her up into the air and allowing her to fall onto the floor?" Uncle answered, "Yes."

{14} Sergeant Miranda then showed Uncle a photograph of Baby's anus. Uncle immediately said, "Oh, no. I didn't do that. I didn't do nothing like that." Uncle asserted that neither Father nor any other males in the house were responsible for sexual abuse towards Baby. Sergeant Miranda therefore asked Uncle what he did with Baby. Uncle was equivocal and said he did not remember. Sergeant Miranda later asked, "Could it have been you?" Uncle answered: "Maybe. I don't know." Uncle asked, "What if I did do it?" and "What can happen to me?" Uncle then talked about how many beers he drank, and told Sergeant Miranda he could not remember starting the sex act but he remembered stopping it because he realized it was wrong. Later, Uncle said he remembered starting the act, and that Baby was awake at the time. Sergeant Miranda then asked

point-blank: "Did you have sex with [Baby]?" Uncle answered: "Yes."

### D. Second Uncle's Statements

{15} Investigator Boeglin also interviewed Baby's second uncle. He told Investigator Boeglin he came home from work around 8:15 a.m. and heard Baby crying. Mother was making her a bottle. Later, grandmother woke him up and was hysterical. Father was crying and throwing up and Mother was giving Baby CPR. He told Investigator Boeglin that grandmother had recently seen Father throwing Baby up into the air, and grandmother told him, "If you don't cut that shit out I'm going to take [Baby] away from you."

### THE MOTIONS FOR SEVERANCE AND TO SUPPRESS

{16} Prior to trial, the State filed a statement for joinder seeking a joint trial of all Defendants. In response, Father filed an opposition to the statement for joinder stating in part, "[e]ach of the Defendants may give statements that would be inadmissible against the other party and therefore a violation of each defendant's right to cross-examine the witnesses against them." Mother filed a motion for severance arguing in part that all defendants had given statements to law enforcement officers and specifically that Father and Uncle had made admissions of their own abusive or negligent conduct which would be inadmissible against Mother in a separate trial. Uncle joined in the motion for severance and he argued in part that "[t]here are statements and confessions which should be limited to the defendant who made them."

{17} The severance question was heard by the trial court at a pretrial hearing. At the hearing, general assertions were made by counsel for Defendants that statements made by the others were accusatory to them and inadmissible hearsay. Defendants contended that admitting these statements into evidence would result in the admission of statements they could not cross-examine and that this would violate their confrontation rights. The trial court denied severance.

{18} Father renewed the motion for severance immediately prior to trial, and all De-

fendants renewed the motion for severance following opening statements. Defendants added at this time that *Bruton* would be violated by admission of their respective statements in a joint trial. Mother suggested that an appropriate alternative to severance would be to redact all the accusations Father made against her from his statements before admitting them into evidence. All motions were again denied, with the trial court stating that each Defendant had preserved the issue. Defendants were granted a continuing objection to the admission of statements made by each other.

{19} Father also filed a motion to suppress the statements he gave to Officer Wright and Sergeant Miranda, asserting the statements were involuntary and that he was entitled to receive *Miranda* warnings before the interview commenced. Since Father did not file the motion until the morning of the pretrial hearing and the trial court had not seen it, a ruling on the motion was deferred until the morning of trial. Following a hearing during the trial, the motion was denied.

{20} In its final instructions, the trial court instructed the jury that before it could consider Father's statement and Uncle's statement for any purpose, it must first determine that each such statement was given voluntarily. The jury was also told that Mother's statement given to investigator Mark Perea could only be considered as evidence against her and not any other Defendant. Similarly, the jury was instructed that second uncle's statement to Investigator Greg Boeglin could only be considered against him and not against any other Defendant.

ANALYSIS

■ {21} We first address Father's motion to suppress and preservation before beginning our confrontation clause analysis. In determining whether Father's motion to suppress was properly denied, we decide whether the law was properly applied to the facts, viewing the facts in the light most favorable to the State as the prevailing party, indulging all reasonable inferences in support of the trial court's ruling, and disregarding all evidence and inferences to the contrary. *See State v. Jason L.*, 2000–NMSC–018, ¶ 10, 129 N.M. 119, 2 P.3d 856; *State v. Joe*, 2003–

NMCA–071, ¶ 6, 133 N.M. 741, 69 P.3d 251. Father argues on appeal that his statement was involuntary and should be suppressed because no *Miranda* warnings were given to him at the beginning of his interview and that subsequently giving him the warnings did not cure the initial failure to advise him of his *Miranda* rights. Applying the foregoing standard of review, we disagree and affirm the trial court.

{22} Further, we conclude that Defendants properly preserved for appeal their argument that their Confrontation Clause rights were violated when they were denied separate trials. *See State v. Martinez*, 1996–NMCA–109, ¶¶ 11–12, 122 N.M. 476, 927 P.2d 31 (holding that Confrontation Clause claim was preserved for appellate review because a decision of the trial court was fairly invoked even though the defendant did not specifically mention the Confrontation Clause or his constitutional right to confront the witnesses at the motions hearing).

A. **Right of Confrontation and Cross–Examination**

■ {23} We are thus squarely confronted with the question of whether Defendants' Confrontation Clause rights were violated. This presents an issue of law which we review de novo. *Id.* at ¶ 14.

{24} We begin with cases leading up to *Crawford*. In *Delli Paoli v. United States*, 352 U.S. 232, 233, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), a joint trial resulted in the conviction of five co-defendants of conspiring to possess and transport alcohol in unstamped containers and evade payment of federal taxes on the alcohol. None of the defendants testified at trial. However, one of the defendants gave a written confession after the conspiracy ended, *id.*, and it was admitted into evidence with repeated instructions that it was to be considered solely in determining the guilt of the confessing defendant and not the guilt of any other defendant. *Id.* at 234. The United States Supreme Court held that no reversible error was committed in admitting the confession at the joint trial. *Id.* at 243, 77 S.Ct. 294. Five Justices assumed that the jury followed the instructions of the trial court that the confession was not to be

considered in determining the guilt or innocence of the non-confessing defendants. Further, the majority observed, the confession merely corroborated what the government otherwise proved independent of the confession. *Id.* at 241–42, 77 S.Ct. 294. Four justices dissented, concluding that the trial court's admonition could not effectively wipe out the confession from the minds of the jurors. *Id.* at 246–47, 77 S.Ct. 294. Giving the limiting instruction was described as a " 'recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody else's.' " *Id.* at 247, 77 S.Ct. 294 (quoting Judge Learned Hand in *Nash v. United States,* 54 F.2d 1006, 1007 (2d Cir.1932)). In response to the majority's observation that the co-defendants' guilt was otherwise proven by non-hearsay evidence, the dissent emphasized this was the best reason for trying them free from the inevitable unfairness of being affected by evidence which was not admissible against them. *Delli Paoli,* 352 U.S. at 248, 77 S.Ct. 294.

{25} *Delli Paoli* was overruled in *Bruton,* 391 U.S. at 126, 88 S.Ct. 1620. In *Bruton,* two defendants were jointly tried for the armed robbery of a post office. *Id.* at 124, 88 S.Ct. 1620. The co-defendant confessed to a postal inspector that he and Bruton had committed the armed robbery. *Id.* Neither defendant testified, but the confession inculpating Bruton was admitted into evidence with instructions to the jury that it was to disregard the confession in determining Bruton's guilt or innocence. *Id.* The Supreme Court expressly repudiated *Delli Paoli* and held that under the circumstances, Bruton's constitutional right of cross-examination secured by the Confrontation Clause of the Sixth Amendment to the United States Constitution was violated. *Bruton,* 391 U.S. at 126, 88 S.Ct. 1620. The holding was based on the recognition that despite the instructions to the contrary, there was an unacceptable risk that the jury would look to the incriminating extrajudicial confession of the co-defendant in determining Bruton's guilt. *Id.* The co-defendant's confession was properly before the jury during its deliberation in considering his guilt, so there was a likelihood that the jury would believe he made the statements and that not only were the self-incrim-

inating portions true, but those implicating Bruton as well. *Id.* at 127, 88 S.Ct. 1620. Thus, introduction of the co-defendant's confession added weight to the prosecution's case in a form not subject to cross-examination. *Id.* at 127–28, 88 S.Ct. 1620. A jury cannot follow an instruction to consider a confession as it relates to a defendant making the confession but ignore it where it simultaneously inculpates the co-defendant. *Id.* at 129–30, 88 S.Ct. 1620. The Supreme Court agreed that such an instruction " 'is a kind of "judicial lie" [which] undermines a moral relationship between the courts, the jurors, and the public; like any other judicial deception, it damages the decent judicial administration of justice.' " *Id.* at 132–33 n. 8, 88 S.Ct. 1620 (quoting *United States v. Grunewald,* 233 F.2d 556, 574 (2d Cir.1956) (Frank, J., dissenting)).

{26} In *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), the United States Supreme Court considered, but was unable to decide, an additional element in the *Bruton* matrix: whether *Bruton* applies when the defendant has confessed and his confession interlocks with and supports the co-defendant's confession. *Parker,* 442 U.S. at 64, 99 S.Ct. 2132. This prosecution for murder during the commission of a robbery consisted primarily of "interlocking" confessions of the respondents, none of whom testified. *Parker,* 442 U.S. at 66, 99 S.Ct. 2132. The confessions were admitted through the testimony of several police officers, with instructions to the jury that each confession could be used only against the defendant who gave it and could not be considered as evidence of a co-defendant's guilt. *Id.* at 66–67, 99 S.Ct. 2132. All of the defendants were convicted. *Id.* at 66, 99 S.Ct. 2132. The Tennessee Supreme Court characterized the confessions as "interlocking inculpatory confessions" which "clearly demonstrated the involvement of each, as to crucial facts such as time, location, felonious activity, and awareness of the overall plan or scheme," and concluded no *Bruton* violation occurred. *Parker,* 442 U.S. at 67–68, 99 S.Ct. 2132 (internal quotation marks and citation omitted). The United States District Court for the District of Tennessee disagreed

and granted writs of habeas corpus to the respondents, which the Court of Appeals for the Sixth Circuit affirmed. *Id.* at 68, 99 S.Ct. 2132. Two different views emerged in the Supreme Court on whether *Bruton* was violated.

{27} The first view in *Parker* reasoned that a defendant's own confession constitutes the most "damaging" and "probative" evidence against him. 442 U.S. at 72, 99 S.Ct. 2132 (internal quotation marks and citation omitted). Thus, when a defendant admits his own guilt, the incriminating statements of a co-defendant will seldom, if ever, have a "devastating" effect on the defense. *Id.* at 72–73, 99 S.Ct. 2132 (internal quotation marks and citation omitted). Under this view, the constitutional right of cross-examination "has far less practical value to a defendant who has confessed to the crime than to one who has consistently maintained his innocence." *Id.* at 73, 99 S.Ct. 2132. The justices subscribing to this view would therefore "hold that admission of interlocking confessions with proper limiting instructions conforms to the requirements of the Sixth and Fourteenth Amendments to the United States Constitution." *Id.* at 75, 99 S.Ct. 2132.

{28} The second view expressed in *Parker* was that just because a defendant made an extrajudicial admission of guilt which was unchallenged before the jury "is not an acceptable reason for depriving him of his constitutional right to confront the witnesses against him." 442 U.S. at 84, 99 S.Ct. 2132 (Stevens, J., dissenting). Creating a *Bruton* exception when there are "interlocking" confessions makes two invalid assumptions. "First, it assumes that the jury's ability to disregard a co[-]defendant's inadmissible and highly prejudicial confession is invariably increased by the existence of a corroborating statement by the defendant." *Parker,* 442 U.S. at 84, 99 S.Ct. 2132. This assumption fails because it remains unrealistic to assume that the jury will follow the judge's instructions to disregard the co-defendant's confession when evaluating each defendant's guilt. *Id.* at 87–88, 99 S.Ct. 2132. Secondly, such an exception to *Bruton* is based on the false assumption "that all unchallenged confes-

sions by a defendant are equally reliable." *Parker,* 442 U.S. at 84, 99 S.Ct. 2132. This assumption is false because of the "infinite variability" of inculpatory statements which defendants and co-defendants can make and their likely effect on juries. *Id.* A plurality decision resulted because Justice Blackmun concluded that any error which resulted from the admission of the confessions in violation of *Bruton* was harmless beyond a reasonable doubt. *Id.* at 77, 99 S.Ct. 2132 (Blackmun, J., concurring in part and concurring in the judgment).

{29} The United States Supreme Court adopted the second *Parker* view when it decided *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). The question presented was "whether *Bruton* applies where the defendant's own confession, corroborating that of his co[-]defendant, is introduced against him." *Cruz,* 481 U.S. at 188, 107 S.Ct. 1714. The New York Court of Appeals had affirmed the defendant's murder conviction after concluding that "*Bruton* did not require the co[-]defendant's confession to be excluded because [the defendant] had himself confessed and his confession 'interlocked' with [co-defendant's]." *Cruz,* 481 U.S. at 189, 107 S.Ct. 1714. The United States Supreme Court reversed, holding that "where a nontestifying co[-]defendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." *Id.* at 193, 107 S.Ct. 1714 (internal citation omitted). The basis for the holding is the recognition that a nontestifying co-defendant's confession which interlocks with the defendant's corroborates the defendant's own confession, making it even more damaging to the defendant. *Id.* at 192, 107 S.Ct. 1714. Again, the Supreme Court recognized that a jury could not be expected to follow an instruction to ignore the co-defendant's confession whose reliability was now enhanced by the defendant's own confession. *Id.* at 193, 107 S.Ct. 1714. "Having decided *Bruton,* we must face the honest consequences of what it holds." *Id.*

**{30}** Finally, *Crawford* unequivocally and without exception holds that the admission of "testimonial evidence" to prove the truth of the matter violates the Confrontation Clause of the Sixth Amendment unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354. Specifically, these are "demands" the Sixth Amendment requires to be satisfied to protect the constitutional right of confrontation where hearsay "testimonial evidence" is admitted into evidence against a criminal defendant. *See id.* *Crawford* therefore assumes that certain statements are admissible under traditional hearsay rules, but if they constitute "testimonial evidence," their admission violates confrontation unless the *Crawford* requirements are satisfied. *Id.* In this case, the statements made by Mother, Father, and Uncle to the police are specifically designated as "testimonial evidence" by *Crawford:* "Whatever else the term [testimonial evidence] covers, it applies at a minimum to ... police interrogations." *Id.* Furthermore, no Defendant had an opportunity to cross-examine the other's statements. This would seem to end the inquiry about whether *Crawford* was violated. The State argues that the statements were nevertheless admissible for two reasons.

**{31}** First, the State argues that the statements were admissible under *Crawford* because they were made in furtherance of a conspiracy to cover up the crime. We reject this argument. While *Crawford* notes that statements in furtherance of a conspiracy are not by their nature "testimonial," 541 U.S. at 56, 124 S.Ct. 1354, *Crawford* is also clear and unequivocal in stating that "police interrogations" constitute "testimonial evidence" subject to its requirements. *Id.* at 68, 124 S.Ct. 1354. Therefore, the admission of statements made by a co-conspirator during the course and in furtherance of a conspiracy are governed by Rule 11–801(D)(2)(e) NMRA *unless* the statements are "testimonial." *Cf. State v. Williams*, 131 Wash.App. 488, 128 P.3d 98, ¶¶ 9–11 (2006) (holding that no *Crawford* violation occurred when a co-conspirator's out-of-court statements to various people during the conspiracy were admitted into evidence and the co-conspirator's confes-

sion to the police after his arrest in which he implicated the defendant was neither offered nor admitted into evidence). Since all the statements at issue here constitute "testimonial evidence," under *Crawford*, their admissibility is subject to its requirements. Further, admitting the statements into evidence violated Defendant's confrontation rights because *Crawford's* demands for admissibility were not satisfied.

**{32}** Secondly, the State argues, the statements were not offered for their truth, but to show that Defendants were making up lies to hide the crimes and their consciousness of guilt. *Crawford* specifically acknowledges that, "The [Confrontation] Clause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S. at 60 n. 9, 124 S.Ct. 1354. The State argues the statements are therefore admissible under *Tennessee v. Street*, 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), decided before *Crawford*, and *United States v. Holmes*, 406 F.3d 337 (5th Cir.2005), and *People v. Lewis*, 11 A.D.3d 954, 782 N.Y.S.2d 321 (2004), decided after *Crawford*. However, each of these cases is distinguishable.

**{33}** In *Street*, the prosecutor relied on a detailed statement the defendant gave to police officers in which he admitted to burglary and murder. 471 U.S. at 411, 105 S.Ct. 2078. An accomplice had also given a statement admitting to the crimes. *Id.* At trial the defendant testified he did not commit the burglary or participate in the murder. *Id.* He also maintained that his confession was coerced. *Id.* Specifically, he claimed that an officer read from the accomplice's statement and directed him to say the same thing. *Id.* In rebuttal, the officer testified this did not happen, and the accomplice's statement was introduced into evidence to show it was different from the defendant's, with the jury being instructed that it could not be considered for its truth, but for rebuttal purposes only. *Id.* at 411–12, 105 S.Ct. 2078. In closing arguments the prosecutor referred to the accomplice's statement only to dispute the defendant's claim that he had been forced to repeat the accomplice's statement. *Id.* at

412, 105 S.Ct. 2078. The United States Supreme Court concluded that the Confrontation Clause was not violated because the accomplice's statement was used only for a non-hearsay purpose—to prove what happened when the defendant confessed—and not for a hearsay purpose—to prove what happened at the murder scene. *Id.* at 414, 105 S.Ct. 2078. The Supreme Court expressly stated that if the jury had been asked to infer that the accomplice's statement proved that the defendant participated in the murder, then the evidence would have been hearsay, and Confrontation Clause concerns would have been implicated because the accomplice was not available for cross-examination. *Id.* Our discussion of harmless error which follows demonstrates that the prosecutor argued to the jury that the statements of Mother, Father, and Uncle proved that each was guilty. This fact alone distinguishes *Tennessee* and makes it inapplicable.

{34} In *Holmes*, an attorney was convicted of being in a conspiracy with a court clerk to back-date and file a petition in a medical malpractice case he was handling to make it appear that the petition was filed within the statute of limitations. 406 F.3d at 343–44. Before criminal charges were filed, the clerk gave a deposition in which she supported the defendant's version of what he claimed had occurred. *Id.* at 345, 350. After the indictment was filed, she became physically incapacitated from life-threatening health problems and died while the charges were pending. *Id.* at 346 n. 9. The deposition was admitted into evidence when the defendant did not object to its admission, *id.* at 347, and the defendant then repeatedly argued that the deposition testimony was true. *Id.* at 350. On the other hand, the prosecutor did not offer or use the deposition testimony for its truth, but to prove it was false through independent evidence. *Id.* at 349. Assuming that the deposition was "testimonial" under *Crawford,* the court concluded there was no constitutional error because the prosecutor did not use the deposition testimony to prove the truth of the matter asserted, and this non-hearsay use of the deposition posed no Confrontation Clause concerns. *Holmes,* 406 F.3d at 349. *Holmes* clearly does not assist the State

here. All Defendants objected to admitting the others' statements into evidence, and Defendants did not argue or agree that their respective statements were true. The prosecutor in this case argued not only that the statements were true, but that they proved each Defendant guilty.

{35} Finally, in *Lewis,* the defendant was interviewed by police officers in connection with two murders, and he initially denied all involvement. 782 N.Y.S.2d at 322. The officers were permitted to testify that he admitted his culpability after they told him that his co-defendant had implicated him in the crimes and that there were witnesses who identified him at the crime scene. *Id.* Agreeing that the co-defendant's statement to the officers was "testimonial" under *Crawford,* the court concluded that no Confrontation Clause violation occurred because it was not offered for the truth of the facts asserted therein, but to show the circumstances in which the defendant admitted his guilt and "appropriate limiting instructions" were given to the jury. *Lewis,* 782 N.Y.S.2d at 322. Again, the "testimonial" statements in this case were admitted as substantive proof of guilt, and not for the sole purpose of showing the circumstances under which the statements were given.

{36} We must give effect to and apply the ever-increasing restrictions on the use of a co-defendant's out-of-court statements that begin with *Delli Paoli* and end with *Crawford.* In this case, co-Defendants' statements incriminating Defendants were admitted into evidence without an opportunity for cross-examination. *Cruz* is directly applicable because the statements made by Mother, Father, and Uncle to the police are not independently admissible. In this regard, *Crawford* specifically declares that *Cruz* is faithful to the framers' understanding of the Confrontation Clause because it is a decision in which "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford,* 541 U.S. at 59, 124 S.Ct. 1354. Thus, in light of *Crawford,* we must conclude that Defendants' Confrontation Clause rights protected by the

Sixth Amendment were violated when the interlocking confessions or statements were admitted into evidence at their joint trial. *See State v. Johnson,* 2004-NMSC-029, ¶ 7, 136 N.M. 348, 98 P.3d 998 ("[U]nder *Crawford,* because [the d]efendant did not have an opportunity to cross-examine [the accomplice], the admission of [the accomplice's] statement constituted a per se violation of [the d]efendant's Sixth Amendment right of confrontation."); *see also State v. Forbes,* 2005-NMSC-027, ¶ 13, 138 N.M. 264, 119 P.3d 144 ("In *Crawford,* ... the United States Supreme Court confirmed what the New Mexico Supreme Court announced in [*State v. Earnest,* 103 N.M. 95, 99, 703 P.2d 872, 876 (1985) ]—that a custodial statement by an alleged accomplice to a police officer is not admissible unless the declarant is unavailable and the defendant had an opportunity to cross-examine the declarant."); *State v. Alvarez–Lopez,* 2004-NMSC-030, ¶ 24, 136 N.M. 309, 98 P.3d 699 ("Seen through the newly shaped lens of *Crawford,* ... [i]t is clear from the facts that [the d]efendant had no opportunity to cross-examine [the accomplice].... Therefore, [the d]efendant's Sixth Amendment right to confrontation was violated by the admission of these statements into evidence at his trial.").

**B. Harmless Error**

█ {37} While both *Cruz* and *Crawford* hold that the admission of a non-testifying co-defendant's incriminating statement violates the Confrontation Clause, they both leave open the possibility that the admission of such evidence may nevertheless be harmless. *Cruz,* 481 U.S. at 194, 107 S.Ct. 1714 (noting that the defendant's own confession may be considered on appeal in assessing whether any Confrontation Clause violation was harmless); *Crawford,* 541 U.S. at 42 n. 1, 124 S.Ct. 1354 (expressly declining to express an opinion on whether confrontation violation was harmless).

█ {38} Our own Supreme Court guides us on how to determine whether the admission of a non-testifying co-defendant's incriminating statement in violation of the Confrontation Clause may be considered as harmless error. These decisions are *Johnson,* 2004-

NMSC–029, 136 N.M. 348, 98 P.3d 998 and *Alvarez–Lopez,* 2004-NMSC–030, 136 N.M. 309, 98 P.3d 699. Both decisions inform us that the burden is on the State to establish that the constitutional error was "harmless beyond a reasonable doubt" pursuant to *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (internal quotation marks omitted). *Johnson,* 2004-NMSC–029, ¶ 8, 136 N.M. 348, 98 P.3d 998; *Alvarez–Lopez,* 2004-NMSC–030, ¶ 25, 136 N.M. 309, 98 P.3d 699. Under this inquiry, if there is a "reasonable possibility" that the inadmissible evidence "might have" contributed to a defendant's conviction, the constitutional error is not harmless. *Johnson,* 2004-NMSC–029, ¶ 9, 136 N.M. 348, 98 P.3d 998 (internal quotation marks and citation omitted); *Alvarez–Lopez,* 2004-NMSC–030, ¶ 25, 136 N.M. 309, 98 P.3d 699.

█ {39} In determining whether the error was harmless, we must be able to conclude beyond a reasonable doubt that the jury verdict would have been the same in the absence of the error by looking to the effect that the constitutional error had upon the guilty verdict in *this particular case.* Constitutional error is not harmless simply because there was substantial evidence to support the conviction. The fact that overwhelming evidence of a defendant's guilt is otherwise present is not determinative because a criminal defendant has a constitutional right to have a jury decide guilt or innocence, not appellate court judges during review on appeal. Therefore, notwithstanding the presence of overwhelming evidence of a defendant's guilt, we still examine whether there is a "reasonable possibility" that the erroneous evidence "might have" affected the jury's verdict. *Johnson,* 2004-NMSC–029, ¶¶ 9–11, 136 N.M. 348, 98 P.3d 998; *Alvarez–Lopez,* 2004-NMSC–030, ¶¶ 26–27, 30, 32, 136 N.M. 309, 98 P.3d 699. Unless the answer to this question is "no" the constitutional error is not harmless beyond a reasonable doubt.

{40} In light of the realities recognized by the United States Supreme Court in *Cruz* that a co-defendant's confession which interlocks with a defendant's statement in material respects is not only extremely damaging to

a defendant, but cannot be ignored by a jury in deciding a defendant's guilt, it will be an exceedingly rare case, if one exists, where the erroneous admission of a co-defendant's confession under these circumstances can be deemed harmless beyond a reasonable doubt. Our own Supreme Court has also expressly recognized these realities. In *Alvarez-Lopez*, our Supreme Court agrees that because a defendant's own confession discloses not only how a crime was committed, but also his motive, its impact on the jury is profound to the extent that we may justifiably doubt a jury's ability to put the confession out of its mind even if it is told to do so. "Like a defendant's own confession, the incriminating statements of an accomplice often have a profound impact on the jury's verdict." *Alvarez-Lopez*, 2004-NMSC-030, ¶ 34, 136 N.M. 309, 98 P.3d 699. Therefore, instructs our Supreme Court, we must exercise "extreme caution" before determining that the erroneous admission of a co-defendant's confession that implicates the defendant is harmless. *Id.* (internal quotation marks and citation omitted).

{41} With these principles in mind, we cannot conclude that the Confrontation Clause violation in this case was harmless beyond a reasonable doubt. First, the statements interlock in material respects. Mother's statement establishes that Father and Uncle had in the past thrown Baby back and forth like a ball, striking her head on the ceiling and dropping her. On the night Baby received her fatal injuries, they were doing the same thing with Baby. Father's statement not only corroborates Mother's, he specifically adds that he and Uncle made Baby hit the ceiling and dropped her onto the floor while they were throwing her and that Mother knew it. Uncle also admits he and Father were throwing Baby, hitting her head on the ceiling, and dropping her. Baby's second uncle said grandmother had recently seen Father throwing Baby into the air. Finally, both Father and Uncle confessed to committing acts constituting criminal sexual penetration upon Baby. Under the circumstances, each statement was corroborated by the other in a form that was immune from cross-examination, and no juror could reasonably be expected to isolate and consider each

statement only in connection with the Defendant who made it. On this basis alone, we would be hard pressed to conclude that there is no "reasonable possibility" that the interlocking statements might have contributed to the conviction of each Defendant. *See Johnson*, 2004-NMSC-029, ¶¶ 8-9. Thus, we cannot say that the constitutional error was harmless. *See id.*

{42} Secondly, the closing arguments remove any possibility for us to conclude otherwise. In closing argument, the prosecutor asked the jurors to use each Defendant's statement:

> Remember that you are the judges of the facts. You decide who is telling the truth, who isn't telling the truth, who has a motive for lying, who has a motive for covering up. Even when they give statements to the police. You decide who is telling the truth. If you keep in mind the police took many statements, and maybe you are wondering why. The main reason is they saw this baby girl at the hospital and they had a death, a death by child abuse and no one heard, no one saw, no one knew, and according to everyone in that house, no one is responsible, and the police were determined to find out what happened to this little girl, and that's why once they were able to get a statement from one person that caused them to go to the other person and say, "Wait a minute, you are not telling us the truth, you need to tell us the truth, because [Father] is already telling us that you, too, were throwing it up."

> And he will give it up a little bit. They will go to the other one and say, "wait a minute, [Uncle]," and you can see why the police had to go back and forth, because clearly they were not going to be totally honest to the police. They had something to hide. They did not want the police to know. It wasn't going to be a stretch. Someone in the house killed this baby girl. Someone between the hours of 10:00 at night on the 18th and 10:00 in the morning, 9:45 in the morning on the 19th, someone within that household killed that baby girl.

{43} The prosecutor then proceeded to use Father's statement to argue that Mother and Uncle were guilty and Uncle's statement to argue that Father was guilty. Uncle was prompted to make a motion for a mistrial during the prosecutor's closing argument asserting that the prosecutor's closing argument was urging the jury to use statements made by Defendants against each other. The motion was denied.

{44} In his closing argument, Father asserted that the police never listened to Father and what he was saying. Instead, they interrogated, suggested, intimidated, and asked leading questions to coerce Father into admitting what they wanted him to say. Father argued that he was under great stress and thus susceptible to mental coercion and the suggestiveness of the police officer's interrogations. He contended that his stress was a result of waking up and finding Baby not breathing and subsequently being isolated from the rest of his family. Father asserted that his stress was exacerbated by the officers' strategic actions in withholding the news of Baby's death for several hours, consoling him upon informing him of her death, and then presenting him with the photographs taken of Baby after her death. In conclusion, Father argued that his defense was simple—that he did not do these things to Baby and tried to tell the police initially this was the case, but the police would not listen.

{45} Uncle's closing argument focused on reasonable doubt. He pointed out he initially denied to the police officers any involvement in Baby's abuse and emphasized that no forensic evidence established his involvement in Baby's death. Uncle concluded, "What do we have left? Other than the forced and involuntary admissions in the statements that were taken?"

{46} In her closing argument, Mother emphasized that the forensic evidence at trial established that the bruises and bite marks on Baby could not be dated, supporting an inference that she did not know the complete nature and extent of Baby's injuries. Since the bites and bruises could not be dated, and considering all of Baby's injuries as inflicted the night before, all that was left was Mother's denials of abuse given to Detective Perea. Mother argued, "What we are left with, because the investigation went in the direction it went in, there has been a distortion of the character and the motivations of [Mother]."

{47} In rebuttal closing argument, the prosecutor reiterated her theme of how she wanted the jury to consider Defendants' statements. She said:

Defense counsel for [Father] said that . . . if the police had only listened to the Defendants we might know who actually did this. I really can't tell you how many times the police did statements of all the various people. I think six times for [Uncle], four times for [Father]. I mean, how many opportunities had to be given to these people to tell the truth? So to say "we might know who actually did this if they just listened," well, they were listening, and they were figuring out who was lying to them, because then they'd have to go back, and say, wait a minute, your friend over here said you were there, and you just told me you weren't there. Or, wait a minute, [Father] said that [Uncle], you were throwing the baby up, and you said you weren't. So they were listening, unfortunately, to many lies at the beginning.

{48} The prosecutor specifically urged the jury to consider each Defendant's statements against the other, and the statements corroborated and reinforced each other in ways that positively reinforced the prosecution's case. The jury could not realistically be expected to ignore the interlocking statements in considering the guilt or innocence of the Defendant not making the statement, because each corroborated and reinforced what the Defendant himself or herself said. Furthermore, limiting instructions were only given in relation to the statements given by Mother and Baby's second uncle. No limiting instructions were given in relation to the statements given by Father and Uncle, so the jury was free to consider those statements in considering the guilt of Mother and each other. Finally, none of the statements were subject to cross-examination.

{49} We cannot conclude there is no reasonable possibility that the interlocking statements could have contributed to the guilty verdicts of Mother, Father, or Uncle. Therefore, we hold that the constitutional error committed in these cases was not harmless.

## REMAINING ISSUES

{50} Mother and Father both argue that the evidence is insufficient to support their convictions. Specifically, Mother argues that the evidence is insufficient to support a finding beyond a reasonable doubt that she knowingly and negligently and without justifiable cause placed Baby in a situation that endangered Baby's life or health. Father argues that the evidence is insufficient to support a finding that he committed criminal sexual penetration of a child under thirteen years of age. We disagree and conclude that Mother's own statement and the non-hearsay forensic evidence could constitute sufficient evidence to support guilty verdicts of negligent child abuse. We also conclude that Father's own statement and the non-hearsay forensic evidence could constitute sufficient evidence to support a guilty verdict of criminal sexual penetration. *See State v. Reyes,* 2002–NMSC–024, ¶ 43, 132 N.M. 576, 52 P.3d 948 (reiterating that substantial evidence of a direct or circumstantial nature must exist to support verdict of guilt beyond a reasonable doubt as to each essential element of the crime, and that on appeal, we must view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict); *State v. Motes,* 118 N.M. 727, 729, 885 P.2d 648, 650 (1994) (noting that because intent is subjective, it is rarely proved by direct evidence and is almost always inferred from other facts in the case).

{51} We do not address any of the other issues raised. An advisory opinion resolves a hypothetical situation that may or may not arise, *see Weddington v. Weddington,* 2004–NMCA–034, ¶ 18, 135 N.M. 198, 86 P.3d 623, and those issues may or may not arise in the separate trials of Defendants.

## CONCLUSION

{52} Punishment for even the most heinous crime can only be imposed following a trial which complies with due process that is mandated by our constitution.

> There are few subjects ... upon which [the United States Supreme Court] and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.

*Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Defendants were unable to exercise their right of confrontation and cross-examination which our constitution says must be present for a criminal trial to be fair.

{53} The convictions are reversed and the cases remanded with instructions to grant each Defendant a separate trial.

{54} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and CELIA FOY CASTILLO, Judges.