2007-NMCA-049

168 P.3d 743

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Steven LOPEZ, Defendant–Respondent.**

**No. 29,801.**

Supreme Court of New Mexico.

Aug. 28, 2007.

Gary K. King, Attorney General, Joel Jacobsen, Assistant Attorney General, Santa Fe, NM, for Petitioner.

Law Office of J.B. Jacks, Jack Bennett Jacks, Albuquerque, NM, for Respondent.

## OPINION

MAES, Justice.

{1} Defendant, Steven Lopez, was tried with four codefendants facing various charges as a result of the death of Defendant's five-month-old niece, Baby Briana. This Court examined the cases of two of Defendant's codefendants, Stephanie Lopez, Baby Briana's mother (Mother), and Andrew Walters, Baby Briana's Father (Father). *See State v. Lopez*, 2007–NMSC–037, 142 N.M. 138, 164 P.3d 19; *State v. Walters*, 2007–NMSC–050, 142 N.M. 644, 168 P.3d 1068 (No. 29,806, filed Aug. 2007). The question raised in Defendant's case mirrors the issue this Court addressed in *Lopez* and *Walters:* whether Defendant's Sixth Amendment right to confrontation was violated when the custodial statements of his codefendants were admitted at his joint trial. Just as we held in *Lopez* and *Walters,* we hold that Defendant's right to confrontation was violated when his codefendants' statements were introduced as evidence. We determine, however, that this constitutional error was harmless with regard to Defendant's convictions

for intentional child abuse resulting in death or great bodily harm and criminal sexual penetration in the first degree, and we affirm Defendant's convictions for those crimes. We conclude that this error was not harmless as to Defendant's conspiracy conviction and reverse that conviction.

## BACKGROUND

{2} Defendant was convicted of intentional child abuse resulting in death or great bodily harm, contrary to NMSA 1978, § 30–6–1 (2001); conspiracy to commit intentional child abuse resulting in death or great bodily harm, contrary to NMSA 1978, § 30–28–2 (1979) and Section 30–6–1; and criminal sexual penetration of a child under thirteen in the first degree, contrary to NMSA 1978, § 30–9–11(A), (C)(1) (2001). Defendant's convictions related to the injuries inflicted on Baby Briana during the last two days of her life.

{3} The tragic facts of this case have been set forth by this Court in *Lopez* and *Walters*. *See Lopez*, 2007–NMSC–037, ¶¶ 2–4, 142 N.M. 138, 164 P.3d 19; *Walters*, 2007–NMSC–050, ¶¶ 2–4. Baby Briana died on July 19, 2002. *Lopez*, 2007–NMSC–037, ¶ 2, 142 N.M. 138, 164 P.3d 19. At the time, Defendant lived in the mobile home of Baby Briana's grandmother and shared a bedroom with Baby Briana, Mother, Father, and Baby Briana's eighteen-month-old brother, Andy Jr. *Id.* On the morning of July 19, 2002, Mother called 911 to report that Baby Briana had stopped breathing. *Id.* ¶ 3. Baby Briana was transported to the hospital where, after attempts to resuscitate her were unsuccessful, she was pronounced dead. *Id.*

{4} The full extent of Baby Briana's injuries were chronicled by this Court in *Lopez* and *Walters*. For the purposes of Defendant's appeal, we only relate those injuries inflicted on Baby Briana in the last days of her life. The autopsy of Baby Briana revealed that she died from cranial cerebral injuries. *Id.* ¶ 4. She had bruising and scraping injuries throughout her head, as well as on her upper forehead. *Id.* She suffered a blunt force injury to her head in the last three days or less of her life which resulted in a large subdural hematoma on her brain. *Walters*, 2006–NMCA–071, ¶ 4, 139 N.M. 705, 137 P.3d 645. Baby Briana had bleeding within the membranes around the brain as well as around her optical nerves which meant that she had been violently shaken. *Lopez*, 2007–NMSC–037, ¶ 4, 142 N.M. 138, 164 P.3d 19. Additionally, Baby Briana's anus and vagina were injured. *Id.* She had a significant abrasion on her buttocks which went into the buttocks and was consistent with sexual assault. *Walters*, 2006–NMCA–071, ¶ 5, 139 N.M. 705, 137 P.3d 645. Immediately after Baby Briana was pronounced dead, the attending nurse observed that her anus had no muscle tone and gaped open. *Id.* At her autopsy, it was observed that Baby Briana's anal opening was dilated to a full inch. *Id.* The internal examination showed a half-inch to an inch injury inside the anal opening as well as vaginal injuries inside Baby Briana's labia minora, including three small injuries to her hymen. *Id.*

## Statements of Defendant and his Codefendants

{5} On the day of Baby Briana's death, Defendant and his codefendants were interviewed by police at the Sheriff's Department. In his statement to police, Defendant said that on the night of July 18, 2002, he was in the bedroom with Mother, Father, Father's brother, Robert Walters (Second Uncle), as well as a friend of Second Uncle. They were drinking beer and playing video games. Defendant acknowledged that he consumed six beers over the course of the night. Initially, Defendant said nothing unusual happened that night, that he slept through the night and was awakened by Second Uncle on the morning of July 19, 2002. Later in the interview, police asked Defendant if anybody had ever throw Baby Briana up in the air and if she had ever hit her head. Uncle admitted to throwing her up in the air so that her head hit the ceiling. Police also confronted Defendant with admissions made by Father regarding the events of July 18, 2002. Defendant then told police that he and Father were throwing Baby Briana up in the air so that she hit her head on the ceiling and allowing her to fall to the floor. Defendant confirmed this statement several times. Defendant was then shown photographs of Baby

Briana's anus. Initially Defendant denied touching Baby Briana's anus, saying, "Oh no. I didn't do that. I didn't do nothing like that." When questioned further, Defendant's response changed to, "I can't remember. I don't remember." Finally, Defendant told police that he was intoxicated and that he could not remember starting the sex act with Baby Briana, but he remembered stopping because he realized what he was doing was wrong.

{6} Mother also gave a statement to police on the day of Baby Briana's death. Mother discussed the events of July 18, 2002. She told police that she had two to three beers and fell asleep at 10:00 p.m. In describing the events of that evening, Mother did not mention Defendant except to say that he remained awake with Father and Second Uncle after she fell asleep. Mother said that she woke up at 9:45 a.m. on July 19, 2002, and saw that Baby Briana was pale and that she was not breathing, so she and Father called Grandmother and then called 911. Mother stated that she asked Father what had happed to Baby Briana and Father said, "maybe [Defendant] threw the baby up."

{7} Father was also interviewed by police investigators on the day of Baby Briana's death. His interview lasted several hours and was taped. Father confirmed that he was in the bedroom with Defendant, Mother, and Second Uncle, drinking beer and playing video games. Initially, Father stated that Baby Briana had fallen off the bed during the night. Later in the interview, Father admitted that he and Defendant had been "playing rough" with Baby Briana. Father said they threw Baby Briana into the air so that she hit the ceiling, and allowed her to drop to the floor when he "missed" her. Father acknowledged that he threw Baby Briana into the air, and on three occasions her head hit the ceiling, and he allowed her to fall to the floor between two and three times. Father said Baby Briana cried when she was dropped onto the floor, and when he was asked what he did to calm her down, he answered, "I just kept throwing her in the air."

{8} With regard to Baby Briana's sexual injuries, when Father was shown a photograph of Baby Briana's anus he became very upset and profane, saying to police that they were "not going to find any semen." Father told police he cleaned Baby Briana's butt with a baby wipe, wrapped the baby wipe around his left index finger, and put the wrapped finger into Baby Briana's anus up to the second knuckle at the middle of his finger. When he took his finger out, "[t]here was a little bit of blood on there." Father stated that he did not think Defendant was capable of causing the injury to Baby Briana's anus.

**Defendant's Trial**

{9} Defendant was charged with intentional child abuse resulting in death or great bodily harm, conspiracy to commit intentional child abuse, and criminal sexual penetration in the first degree. Defendant's trial was joined with that of his codefendants: Mother, Father, Grandmother, and Second Uncle. The State filed a Statement of Joinder, requesting that Defendant be tried together with Mother, Father, Grandmother, and Second Uncle. Defendant joined Mother's Motion to Sever her trial from that of her codefendants. In her Motion to Sever, Mother asserted that her right to confrontation would be violated in a joint trial if the custodial statements of her codefendants were admitted as evidence at trial. *Lopez*, 2007–NMSC–037, ¶ 1, 142 N.M. 138, 164 P.3d 19. The trial court denied the codefendants' motion to sever the trials and proceeded with the joint trial. The statements of the codefendants were admitted over Defendant's renewed objection that the admission of these statements would violate his right to confront the witnesses against him.

{10} Defendant was convicted of each of the charges, and he appealed to the Court of Appeals. The Court of Appeals determined that the admission of the statements each codefendant made during police interrogations violated Defendant's confrontation rights and that this error was not harmless. *State v. Walters*, 2006–NMCA–071, ¶ 1, 139 N.M. 705, 137 P.3d 645. The Court of Appeals reversed the convictions of Defendant and his codefendants and remanded with the instruction that each of the codefendants be

tried separately. *Id.* The State appealed to this Court.

## DISCUSSION

### Preservation

■ {11} We begin by addressing the State's claim that Defendant failed to adequately preserve his argument that the statements of his codefendants were inadmissible against him, and the admission of those statements violated the Confrontation Clause. As in *Lopez* and *Walters,* the State argues that Defendant's objections were not adequate to preserve this issue for appeal.

■ {12} "[T]o preserve an issue for appeal, a defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon." *Lopez,* 2007–NMSC–037, ¶ 15, 142 N.M. 138, 164 P.3d 19 (citing Rule 12–216 NMRA; *State v. Varela,* 1999–NMSC–045, ¶ 25, 128 N.M. 454, 993 P.2d 1280). In *Lopez,* we held that Mother's Motion to Sever and her renewed objections throughout trial adequately alerted the court to the argument that the admission of codefendants' statements would result in a violation of her Sixth Amendment right to confront witnesses against her. 2007–NMSC–037, ¶ 16, 142 N.M. 138, 164 P.3d 19. We conclude that by joining in Mother's Motion to Sever and raising repeated objections to the admission of the codefendants' statements, Defendant also properly preserved the issue for appeal.

### Sixth Amendment Right to Confrontation

■ {13} In his brief to this Court, Defendant asserts that the Court of Appeals was correct in holding that the admission of his codefendants' statements violated his Sixth Amendment right to confrontation. We review de novo the issue of whether Defendant's Sixth Amendment right was violated when the trial court admitted the custodial statements of his codefendants. *See Lilly v. Virginia,* 527 U.S. 116, 136–37, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999); *Walters,* 2007–NMSC–050, ¶ 20; *Lopez,* 2007–NMSC–037, ¶ 18, 142 N.M. 138, 164 P.3d 19.

■ {14} Consistent with our holdings in the *Lopez* and *Walters* cases, we hold that the trial court's admission of the codefendants' statements constituted a "per se" violation of Defendant's Sixth Amendment right of confrontation. *See Lopez,* 2007–NMSC–037, ¶ 21, 142 N.M. 138, 164 P.3d 19; *Walters,* 2007–NMSC–050, ¶ 24. As discussed in *Lopez,* "[t]he Confrontation Clause bars the 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" 2007–NMSC–037, ¶ 19, 142 N.M. 138, 164 P.3d 19 (quoting *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). It is undisputed that Defendant did not have a prior opportunity to cross-examine his codefendants. Additionally, we determine that the codefendants' statements, elicited by police officers investigating Baby Briana's death, are testimonial for the purposes of *Crawford. See Lopez,* ¶ 20 ("[P]olice interrogations produce testimony when 'the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'") (quoting *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 2274, 165 L.Ed.2d 224 (2006)). Thus, we hold that Defendant's constitutional right to confront witnesses against him was violated when the custodial statements of his codefendants were admitted at his joint trial. *See id.* ¶ 21 (citing *State v. Johnson,* 2004–NMSC–029, ¶ 7, 136 N.M. 348, 98 P.3d 998 ("[U]nder *Crawford,* because Defendant did not have an opportunity to cross-examine [the witness], the admission of [his] statement constituted a per se violation of Defendant's Sixth Amendment right of confrontation.")).

### Harmless–Error Analysis

■ {15} "Violations of the Confrontation Clause are subject to harmless error analysis." *Walters,* 2007–NMSC–050, ¶ 25. As in *Lopez* and *Walters,* we examine each of Defendant's convictions separately to determine if the constitutional violation may be characterized as harmless with respect to any of Defendant's convictions. *See Lopez,* 2007–NMSC–037, ¶ 24, 142 N.M. 138, 164 P.3d 19 ("Because our harmless-error analysis instructs that error may be prejudicial

with respect to one conviction, but harmless with respect to another, we review the effect of [codefendant's] statement with respect to each conviction separately."). A constitutional violation may be deemed harmless when there is no " 'reasonable possibility that the evidence complained of might have contributed to the [defendant's] convictions.' " *State v. Johnson*, 2004–NMSC–029, ¶ 9, 136 N.M. 348, 98 P.3d 998 (quoting *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). We look to a variety of factors in order to determine if erroneously admitted testimony may be deemed harmless.

> These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Johnson*, 2004–NMSC–029, ¶ 11, 136 N.M. 348, 98 P.3d 998 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). We apply these factors to each of Defendant's convictions.

## I. Intentional Child Abuse Resulting in Death or Great Bodily Harm

■ {16} The charge of intentional child abuse resulting in death or great bodily harm arose from the injuries inflicted on Baby Briana in the last two days of her life. "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health; (2) tortured, cruelly confined or cruelly punished...." Section 30–6–1(D). "[T]o obtain a conviction under the theory of intentional child abuse, the State was required to prove beyond a reasonable doubt that (1) Defendant caused Baby Briana to be placed in a situation [situation] which endangered her life or health, or tortured or cruelly confined or punished Baby Briana; (2) Defendant acted intentionally; and (3) Defendant's actions resulted in the death of or great bodily harm to Baby Briana." *Walters*, 2007–NMSC–050,

¶ 28 (citing UJI 14–602 NMRA (defining the elements of intentional child abuse resulting in great bodily harm)).

{17} We review the codefendants' statements related to Defendant's actions during the last two days of Baby Briana's life in order to determine the impact of those statements and whether their erroneous admission may be characterized as harmless. In her statement to police, Mother did not mention Defendant's behavior except to say that he was in the bedroom with her and Baby Briana and that he remained awake after she fell asleep. Father's statement to police was more condemnatory. He told police investigators that he and Defendant had been "playing rough" with Baby Briana and that they threw her up in the air so her head hit the ceiling and allowed her to fall to the floor. During his police interrogation, Defendant confirmed the information Father gave in his statement several times. First, Defendant admitted to throwing her up in the air so that her head hit the ceiling. Then, Defendant told police that he and Father were throwing Baby Briana up in the air and allowing her to fall to the floor.

{18} Applying the first factor listed in *Johnson* to Mother's and Father's erroneously admitted statements, we acknowledge that "in many cases eyewitness testimony describing a defendant's participation in child abuse would be tremendously important to the prosecution's case." *Walters*, 2007–NMSC–050, ¶ 32. As to the second *Johnson* factor, whether the erroneously admitted evidence was cumulative, Mother's and Father's statements merely tend to prove the elements already established by Defendant's confession. Defendant's confession constituted direct evidence sufficient to establish each element of intentional child abuse resulting in death or great bodily harm. Therefore Mother's and Father's statements may be characterized as cumulative. *Johnson*, 2004–NMSC–029, ¶ 38, 136 N.M. 348, 98 P.3d 998 (stating "[c]umulative evidence is additional evidence of the same kind tending to prove the same point as other evidence already given"). Considering the third *Johnson* factor, the presence or absence of evidence corroborating or contradicting the testimony of

the witnesses on material points, the evidence of blunt force injury to Baby Briana's head corroborates Defendant's confession that he threw Baby Briana up so that her head hit the ceiling, as well as the statements of Mother and Father. *See Walters,* 2007–NMSC–050, ¶ 32. It is undisputed that Defendant did not have the opportunity to cross examine his codefendants, the fourth *Johnson* factor. However, the overall strength of the prosecution's case, the final *Johnson* factor, cannot be minimized. In his confession, Defendant repeatedly confirmed that he and Father threw Baby Briana up in the air so that she hit her head on the ceiling and allowed her to fall to the floor. In light of Defendant's confession and Baby Briana's injuries substantiating his confession, we hold that the trial court's admission of Mother's and Father's statements was harmless beyond a reasonable doubt with regard to Defendant's conviction of intentional child abuse resulting in death or great bodily harm.

## II. Criminal Sexual Penetration of a Child Under Thirteen in the First Degree

{19} "Criminal sexual penetration is the unlawful and intentional causing of a person to engage in sexual intercourse, cunnilingus, fellatio or anal intercourse or the causing of penetration, to any extent and with any object, of the genital or anal openings of another, whether or not there is any emission." Section 30–9–11(A). All sexual penetration perpetrated on a child under thirteen years of age is criminal sexual penetration in the first degree. Section 30–9–11(C). Under this theory of liability, the State was required to prove, in relevant part, that (1) Defendant caused Baby Briana to engage in anal intercourse; (2) Baby Briana was twelve years of age or younger; and (3) Defendant's act was unlawful. *See* UJI 14–957 NMRA (defining the elements of criminal sexual penetration of a child under thirteen years of age).

{20} With regard to the charge of criminal sexual penetration, the statements of Defendant's codefendants are largely silent. Only Father remarked about Baby Briana's sexual injuries, and he specifically said that he did not think Defendant was capable of causing the injury to Baby Briana's anus. During his interview with police, Defendant eventually told police that he could not remember starting the sex act with Baby Briana but that he remembered stopping because he realized what he was doing was wrong. Because his codefendants' statements did not strengthen Defendant's confession or the corroborating physical evidence of guilt, we conclude that the admission of the statements was harmless beyond a reasonable doubt with respect to his conviction for criminal sexual penetration. *See Johnson,* 2004–NMSC–029, ¶ 53, 136 N.M. 348, 98 P.3d 998.

## III. Conspiracy to Commit Intentional Child Abuse

{21} "Conspiracy consists of knowingly combining with another for the purpose of committing a felony within or without this state," Section 30–28–2. "An overt act is not required and the crime of conspiracy is complete when the felonious agreement is reached." *Walters,* 2007–NMSC–050, ¶ 42 (citing *Johnson,* 2004–NMSC–029, ¶ 49, 136 N.M. 348, 98 P.3d 998). To obtain a conviction under the theory of conspiracy, the State was required to prove beyond a reasonable doubt that: (1) Defendant and Father by words or acts agreed together to commit intentional child abuse resulting in death or great bodily harm and (2) Defendant and Father intended to commit intentional child abuse resulting in death or great bodily harm. *See* UJI 14–2810 NMRA (defining the elements of conspiracy).

{22} The inculpatory statements related to the charge of conspiracy are the following. Mother said that on the morning of July 19, 2002, Father told her that he threw Baby Briana up in the air once and "maybe [Defendant] threw the baby up." Father also implicated Defendant in his statement to police. Father stated that he and Defendant were "playing rough" with Baby Briana and indicated Defendant participated in throwing Baby Briana to the ceiling and allowing her to fall to the floor. In his statement to police, Defendant admitted that on the night of July 18, 2002, he had thrown Baby Briana in the air so that she hit her head on the

ceiling and that Father threw her in the air so she hit her head on the ceiling twice.

{23} As in *Walters,* we conclude that the codefendants' statements were important to the prosecution's case. While the codefendants' statements do not constitute direct evidence of the existence of an agreement between Defendant and Father to commit intentional child abuse, Mother's and Father's statements related circumstances from which the jury could infer that Defendant and Father had agreed to act together to abuse Baby Briana. *Walters,* 2007–NMSC–050, ¶¶ 43–44. There is no direct evidence of conspiracy in this case, as neither Defendant nor Father acknowledged that they had entered an agreement to commit child abuse, and no other witness testified as to the existence of an agreement between Defendant and Father. Thus, the statements from Defendant's alleged coconspirator that he and Defendant were acting in conjunction with one another were important to the prosecution's case. We acknowledge that Defendant himself confessed to acting together with Father, making Father's and Mother's statements cumulative. However, because Defendant's statement is the only properly admitted piece of evidence to support the prosecution's conspiracy theory, we conclude that the admission of his codefendants' statements was not harmless beyond a reasonable doubt. *Id.*

## CONCLUSION

{24} With regard to Defendant's convictions for intentional child abuse resulting in death or great bodily harm and criminal sexual penetration of a child under thirteen years of age in the first degree, we affirm Defendant's convictions, and we reverse the Court of Appeals' decision to overturn Defendant's convictions and remand for a separate trial. However, with regard to Defendant's conviction for conspiracy to commit intentional child abuse resulting in death or great bodily harm, we affirm the Court of Appeals' decision to reverse Defendant's conviction. Accordingly, we vacate the Defendant's conspiracy conviction and remand for a new trial in which Defendant may be retried on that count.

{25} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PATRICIO M. SERNA, RICHARD C. BOSSON, JJ., and PAMELA B. MINZNER, Justice (not participating).