2007-NMSC-050

168 P.3d 1068

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Andrew WALTERS, Sr., Defendant–Respondent.**

No. 29,806.

Supreme Court of New Mexico.

Aug. 28, 2007.

Gary K. King, Attorney General, Joel Jacobsen, Assistant Attorney General, Santa Fe, NM, for Petitioner.

Law Offices of Nancy L. Simmons, P.C., Nancy L. Simmons, Albuquerque, NM, for Respondent.

## OPINION

MAES, Justice.

{1} As a result of the death of Defendant's five-month-old daughter, Baby Briana, a jury convicted Defendant, Andrew Walters, of intentional child abuse resulting in death or great bodily harm, contrary to NMSA 1978, § 30–6–1 (2001); conspiracy to commit intentional child abuse resulting in death or great bodily harm, contrary to NMSA 1978, § 30–28–2 (1979) and Section 30–6–1; criminal sexual penetration of a child under thirteen in the first degree, contrary to NMSA 1978, § 30–9–11(A), (C)(1) (2001); intentional child abuse not resulting in death or great bodily harm, contrary to Section 30–6–1; and negligently permitting child abuse, contrary to Section 30–6–1. Defendant was tried with four codefendants who faced various charges related to Baby Briana's death. Previously, this Court examined the appeal of Defendant's codefendant, Baby Briana's mother, Stephanie Lopez (Mother). *See State v. Lopez*, 2007–NMSC–037, 142 N.M. 138, 164 P.3d 19. Like Mother, Defendant appealed his convictions to the Court of Appeals, asserting that his right to confrontation was violated when the statements of his codefendants were admitted as evidence at his joint trial. The Court of Appeals held that the admission of the codefendants' statements resulted in a violation of Defendant's Sixth Amendment right to confrontation and that this constitutional error was not harmless. *State v. Walters*, 2006–NMCA–071, ¶ 1, 139 N.M. 705, 137 P.3d 645. The Court of Appeals reversed Defendant's conviction and remanded his case with the instruction that Defendant be tried separately. *Id.* The State petitioned this Court to review the Court of Appeals' Opinion. We granted certiorari on the State's petition and hold that the introduction of the codefendants' statements violated Defendant's Sixth Amendment right to confrontation. However, we hold that this error was harmless as to Defendant's convictions for intentional child abuse resulting in death or great bodily harm, criminal sexual penetration of a child under thirteen years of age, intentional child abuse not resulting in death or great bodily harm, and negligently permitting child abuse, and we affirm each of these convictions. With regard to Defendant's conviction for conspiracy to commit intentional child abuse, we hold the violation of Defendant's right to confrontation was not harmless, and we affirm the Court of Appeals' decision to reverse Defendant's conspiracy conviction.

## BACKGROUND

{2} Baby Briana died on July 19, 2002. At the time of Baby Briana's death, Defendant lived in the mobile home of his mother, Patricia Walters (Grandmother), along with Mother. *Lopez*, 2007–NMSC–037, ¶ 2. Defendant and Mother shared one bedroom of the mobile home with Baby Briana, the couple's eighteen-month-old son, Andy Jr., and Mother's twin brother, Steven Lopez (Uncle). *Id.* Also living in the home was Defendant's brother, Robert Walters (Second Uncle), as well as Grandmother's partner. *Id.* ¶ 3.

{3} The events of July 19, 2002, as well as Baby Briana's extensive injuries, were detailed by this Court in *Lopez*.

On the morning of July 19, 2002, Defendant made a 911 call to report that Baby Briana had stopped breathing. Defendant and [Mother] administered C.P.R. on Baby Briana until paramedics arrived and transported her to the hospital. When Baby Briana arrived in the emergency room she had bruises and bite marks on her body and head, and she appeared lifeless. After unsuccessful attempts to resuscitate her, Baby Briana was pronounced dead.... The autopsy of Baby Briana revealed that she died from cranial cerebral injuries. She had bruising and scraping injuries throughout her head, as well as on her upper forehead. She had numerous human bite marks all over her body and head, fifteen in total. There were extensive injuries to Baby Briana's head and fatal injuries to her brain. She had bleeding within the membranes around the brain as well as around the nerves of her eyes. The autopsy revealed that Baby Briana's skull was fractured in two places, on two different bones, and that the fractures were 5–7 days old. An examination of the membranes around the brain showed the presence of both old and new blood, indicating that Baby Briana had received a separate brain injury in the past. Baby Briana's optical nerves were filled with both fresh and old blood which meant that she had been violently shaken on at least two occasions. Baby Briana suffered two rib fractures on the right side of her chest several weeks before her death. She also had bucket handle fractures on both her right and left thigh bones as well as a fracture through the top of her left arm. These injuries were the result of her limbs being forced, twisted, or yanked.... Baby Briana's death was characterized as a homicide.

*Id.* ¶¶ 3–4.

{4} Additionally, Baby Briana's anus and vagina were injured. *Walters,* 2006–NMCA–071, ¶ 5. She had a significant abrasion on her buttocks, which went into the buttocks and was consistent with sexual assault. *Id.* The attending emergency room nurse observed that her anus gaped open with no muscle tone. *Id.* Baby Briana's autopsy revealed that her anal opening was dilated to a full inch, and the internal examination showed a half-inch to an inch injury inside the anal opening as well as vaginal injuries inside Baby Briana's labia minora, including three small injuries to her hymen. *Id.* DNA testing showed the near certain presence of Baby Briana's blood on Defendant's underwear, near the fly.

**Statements of Defendant and his Codefendants**

{5} On the day of Baby Briana's death, Defendant was transported by police investigators to the Sheriff's Department where he was interviewed. Defendant's interview lasted several hours and was taped. In the first portion of his interview, Defendant described the events of the previous night. Defendant told police that he went home after he got off work and was drinking beer and playing video games with Mother, Uncle, and Second Uncle until he went to bed between 12:30 and 1:00 a.m. He said that he woke up sometime after 3:00 a.m. and noticed Baby Briana on the floor, so he put her in her bouncer chair and went to bed. He changed her diaper at approximately 7:00 a.m. and went back to sleep. Defendant said that at 10:00 a.m., he and Mother discovered that Baby Briana was not breathing, and they called 911. In this portion of the interview, Defendant stated that Baby Briana had fallen off her bed during the night. He also admitted he caused two bite marks on Baby Briana's ribs, after initially claiming that his 18–month–old son made the bite marks.

{6} After a break, the police continued interrogating Defendant and informed him that Baby Briana was dead. Defendant then admitted to throwing Baby Briana into the air and said that she hit her head on the ceiling four days before she died. Defendant admitted to bruising Baby Briana, stating "I didn't mean for it to leave a bruise like that. Like I left her a bruise like that before, just from messing with her. [Mother] gets mad." Defendant admitted that on the night of July 18, 2002, he and Uncle were "playing a little rough" with Baby Briana. Defendant said he threw Baby Briana into the air so that she hit the ceiling, and allowed her to drop to the floor when he "missed" her. Defendant iden-

648

tified a particular bruise on a photo as being caused when Baby Briana hit the ceiling and another when she landed on the floor. Defendant acknowledged that he threw Baby Briana into the air, and on three occasions her head hit the ceiling, and he allowed her to fall to the floor two or three times. Defendant said Baby Briana cried when she was dropped onto the floor, and when he was asked what he did to calm her down, he answered, "I just kept throwing her in the air." Defendant also identified various bite marks that he acknowledged he made.

{7} Defendant was shown a photo of Baby Briana's anus. Defendant became very upset and profane, saying to police that they were "not going to find any semen." Defendant told police he cleaned Baby Briana's butt with a baby wipe, wrapped the baby wipe around his left index finger, and put the wrapped finger into Baby Briana's anus up to the second knuckle at the middle of his finger. When he took his finger out, "[t]here was a little bit of blood on there."

{8} Defendant told police that Mother would sometimes get mad at Baby Briana and would pinch Baby Briana's ears and throw Baby Briana into her bouncer chair from a distance of about two feet. Defendant also stated that Mother questioned him about the bruises on Baby Briana, and he informed her that he had been playing rough with her.

{9} Defendant's codefendants were also interviewed at the Sheriff's Department by investigating officers on the day of Baby Briana's Death. Uncle gave an initial statement to police after being informed of his *Miranda* rights. Uncle said that on the night of July 18, 2002, he, Mother, and Defendant were in the bedroom playing video games and drinking beer. Uncle said specifically that Defendant was drinking. In his first statement to police, Uncle said that nothing unusual happened during the night and that he slept through the night and was awakened the next morning by Second Uncle. Later in his interview, police asked Uncle if anybody had ever thrown Baby Briana up in the air and if she had ever hit her head. Uncle admitted to throwing her up in the air so that her head hit the ceiling.

Police subsequently told Uncle that Baby Briana was dead and asked him, "Who would do that to her?" and he replied, "Somebody did."

{10} Later in the interview, police confronted Uncle with admissions made by Defendant regarding the events of July 18, 2002. Uncle told police that Defendant was throwing Baby Briana up into the air. He said that he saw Baby Briana hit her head on the ceiling twice. Uncle admitted that he also threw Baby Briana up in the air. He confirmed that both he and Defendant were throwing Baby Briana up in the air so that she hit her head on the ceiling and then allowing her to fall to the floor. Uncle was then shown photographs of Baby Briana's anus. Initially, Uncle denied touching Baby Briana's anus, saying, "Oh, no. I didn't do that. I didn't do nothing like that." When questioned further, Uncle's response changed to, "I can't remember. I don't remember." Finally, Uncle proceeded to talk about the number of beers he had consumed, and he then said he could not remember starting a sex act with Baby Briana, but he remembered stopping because he realized what he was doing was wrong. Uncle said that Defendant was not to blame for sexually assaulting Baby Briana.

{11} Mother was also interviewed by investigating officers on the day of Baby Briana's death. She said that a couple of days before Baby Briana's death, Defendant had thrown Baby Briana up in the air. Mother stated that she repeatedly told Defendant not to throw Baby Briana up in the air because he was going to hurt the child. Mother, however, attributed the bruises on Baby Briana's forehead to instances when the child rolled off the bed.

{12} During the course of her interview, Mother described the events of July 18, 2002. She said that she had two to three beers and fell asleep at 10:00 p.m. She said that when she fell asleep, Defendant remained awake along with Uncle and Second Uncle. Mother said that she was not awake when Defendant went to sleep. When asked to explain Baby Briana's injuries Mother initially said that she was awakened at 2:00 a.m., and Defendant told her that Baby Briana had fallen off

the bed earlier and that she did not want to wake up, and he was worried. Later Mother stated that this conversation with Defendant took place at 7:00 a.m. on the morning of July 19, 2002, and then she said it occurred at 9:45 a.m. Mother then said that at 7:00 a.m., Defendant took Baby Briana into the living room and then brought her back into the bedroom wrapped in a blanket and placed her under the fan. Mother said that when she finally woke up at 9:45 a.m., she saw that Baby Briana was pale, and she was not breathing and that Defendant was awake and worried. They called Grandmother and then called 911.

{13} When asked by police about the bruises on the back of Baby Briana's head, ears, face, and body, Mother said they had not been there the night before. Mother said that she had asked Defendant what had happened, and Defendant said "maybe [Uncle] threw the baby up." She also stated that she had seen Defendant "throw the baby up." However, Mother stated that she had not seen Defendant throw Baby Briana up in the air on the night of July 18, 2002. Mother attributed the bruising on Baby Briana's ear to the way the baby sleeps and turns her head in her bouncer chair. Mother also said that her son, Andy Jr., was responsible for the bite marks on Baby Briana.

{14} Baby Briana's Second Uncle also gave a taped statement to police on the day of Baby Briana's death. Second Uncle was asked about Baby Briana being thrown up in the air, and he said that his mother, Grandmother, had seen Defendant throw Baby Briana in the air in the past, and Grandmother had told Defendant "If you don't cut that shit out I'm going to take Briana away from you." Second Uncle said that this had occurred a couple of days before Baby Briana's death. At another point in the interview, Second Uncle told police that he had seen Defendant and Uncle throw Baby Briana in the air.

**Defendant's Trial**

{15} As a result of these events, Defendant was charged with intentional child abuse resulting in death, conspiracy to commit intentional child abuse, criminal sexual penetration of a child under thirteen years of age, intentional child abuse not resulting in death or great bodily harm, and negligently permitting child abuse. Mother, Uncle, Grandmother, and Second Uncle also faced various charges as a result of Baby Briana's death. The State filed a Statement of Joinder, requesting that Defendant be tried together with Mother, Uncle, Grandmother, and Second Uncle. In response, Defendant filed an Opposition to Statement for Joinder, asserting that each of the codefendants "may give statements that would be inadmissible against the other party and therefore a violation of each defendant's right to cross-examine the witnesses against them." The trial court held a hearing on the issue of joinder at which time Defendant joined Mother's motion for severance. The trial court denied Defendant's motion to sever and proceeded with the joint trial. The statements of Defendant, Mother, Uncle, Grandmother, and Second Uncle were admitted at Defendant's joint trial over his multiple objections that the admission of these statements would violate his right to confront the witnesses against him.

{16} Defendant was convicted of each of the charges, and he appealed to the Court of Appeals. The Court of Appeals determined that the admission of each codefendant's statements made during police interrogation violated Defendant's confrontation rights and that this error was not harmless. *Walters,* 2006–NMCA–071, ¶ 1. The State appealed to this Court.

**DISCUSSION**

**Preservation**

{17} We begin by addressing the State's claim that, at trial, Defendant failed to adequately preserve his argument that the statements of his codefendants were inadmissible against him and the admission of those statements violated the Confrontation Clause. While acknowledging that Defendant made repeated objections to the admission of his codefendants' statements, the State asserts that Defendant's objections were vague and did not identify with specificity the statements that were the subject of his objection.

■ {18} "In order to preserve an issue for appeal, a defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon." *Lopez*, 2007–NMSC–037, ¶ 15 (citing Rule 12–216 NMRA; *State v. Varela*, 1999–NMSC–045, ¶ 25, 128 N.M. 454, 993 P.2d 1280). Prior to trial, Defendant's Opposition to Statement for Joinder initially alerted the trial court to his assertion that the admission of his codefendants' statements would violate his right to cross-examine the witnesses against him. At the hearing on joinder, Defendant joined in Mother's motion to sever based on the grounds "that she would be prejudiced if the court admitted the statements of [her codefendants]." *Id.* The trial court denied the motion to sever prior to trial and denied it again after Mother renewed her motion after opening statements were made. *Id.* At that time, the court stated:

> Counsel, all of you have made a renewed motion on the record. I don't know that you need to do it over and over again, but you certainly all have a motion for severance. I ruled on it and I intend that be preserved for all of you. I certainly want you to be able to appeal any matter that you feel you should appeal.

*Id.* After the motion for severance was denied, Defendant proceeded to object prior to the admission of the statements of his codefendants. *Id.* Defendant articulated that his objections were based on "hearsay, [the] fifth amendment, and *Bruton.*" *Id.*

{19} We conclude that by filing a Statement Against Joinder, joining Mother's motion to sever, and making objections during trial, Defendant properly preserved his argument that the inclusion of his codefendants' statements resulted in a violation of his Sixth Amendment right to confront witnesses against him. "By including the terms, '*Bruton*' and 'Confrontation Clause' in [the] objections, Defendant effectively put the court on notice of the specific nature of [the] objection and the impropriety of allowing a joint trial where the statements of codefendants would be offered as evidence." *Id.* ¶ 16.

## Sixth Amendment Right to Confrontation

■ {20} We now turn to the substantive issue in this case, whether Defendant's Sixth Amendment right to confront witnesses against him was violated when the statements of his non-testifying codefendants were admitted at his trial. Whether the trial court violated Defendant's Sixth Amendment right to confrontation by admitting the statements of his codefendants, presents a question of law, which we review de novo. *See Lilly v. Virginia*, 527 U.S. 116, 136–37, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999); *Lopez*, 2007–NMSC–037, ¶ 18; *State v. Dedman*, 2004–NMSC–037, ¶ 23, 136 N.M. 561, 102 P.3d 628.

■ {21} As discussed in *Lopez*, "[t]he Confrontation Clause of the Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" 2007–NMSC–037, ¶ 19 (quoting U.S. Const. amend. VI). "The Confrontation Clause bars the 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Id.* (quoting *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). In *Crawford*, the U.S. Supreme Court did not provide a "comprehensive definition of testimonial." *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354. The Court, however, explicitly stated that testimonial statements include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to *police interrogations.*" *Id.* (emphasis added).

{22} The State contends that the bar against the admission of testimonial statements described in *Crawford*, should not be applied to the statements of Mother, Uncle, and Second Uncle. This same assertion was made by the State in *Lopez*, with regard to the statements Defendant and Uncle gave to police. As we said in that case, "[t]he State is correct in the assertion that not all police interrogations produce testimony." *Lopez*, 2007–NMSC–037, ¶ 20. The U.S. Supreme Court has clarified when police interrogations produce testimony for the purposes of *Crawford.* The Court has stated that "police

interrogations produce testimony when 'the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' " *Id.* (quoting 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, *Davis v. Washington,* 547 U.S. 813, ——, 126 S.Ct. 2266, 2274, 165 L.Ed.2d 224 (2006)).

{23} In this case, the codefendants' statements elicited by police clearly fall within the category of "testimony" as described by the U.S. Supreme Court in *Davis.* Defendant, Mother, Uncle, and Second Uncle gave statements to police officers who were investigating Baby Briana's death. The interrogation of the codefendants took place at the police station, hours after Baby Briana was pronounced dead. During the course of their interrogation, police attempted to discover the cause of Baby Briana's death and obtain inculpatory statements from each of the codefendants. The interrogation of the codefendants constituted an effort by the police to "prove past events potentially relevant to later criminal prosecution." *Davis,* 126 S.Ct. at 2274. Thus, we hold that the statements of the codefendants, products of a police investigation, are testimonial for the purposes of *Crawford. See id* at 2273–74.

{24} At trial, the interrogating police officers testified as to the content of the testimonial statements made by Mother, Uncle, and Second Uncle. None of the codefendants testified at Defendant's joint trial, and it is undisputed that Defendant did not have a prior opportunity to cross-examine Mother, Uncle, or Second Uncle. Therefore, the admission of the testimonial statements of the codefendants was clearly contrary to the Supreme Court's holding in *Crawford.* The admission of Mother's, Uncle's, and Second Uncle's statements constituted a "per se" violation of Defendant's Sixth Amendment right to confront the witnesses against him. *See Lopez,* 2007–NMSC–037, ¶ 21 (citing *Johnson,* 2004–NMSC–029, ¶ 7 ("[U]nder *Crawford,* because Defendant did not have an opportunity to cross-examine [the witness], the admission of [his] statement constituted a per se violation of Defendant's Sixth Amendment right of confrontation.") ).

## Harmless–Error Analysis

{25} Violations of the Confrontation Clause are subject to harmless error analysis. *Id.* ¶ 22. An error is harmless if the State can establish that the constitutional error was " 'harmless beyond a reasonable doubt.' " *State v. Alvarez–Lopez,* 2004–NMSC–030, ¶ 25, 136 N.M. 309, 98 P.3d 699 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 630, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). A constitutional error regarding erroneously admitted evidence may be deemed harmless when there is no " 'reasonable possibility that the evidence complained of might have contributed to the [defendant's] conviction.' " *Johnson,* 2004–NMSC–029, ¶ 9 (quoting *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

{26} As we described in *Johnson,* when reviewing whether erroneously admitted testimony may be deemed harmless, this Court examines several factors:

> These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

2004–NMSC–029, ¶ 11, 136 N.M. 348, 98 P.3d 998 (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). We further "emphasize[d] that constitutional error must not be deemed harmless solely based on overwhelming evidence of the defendant's guilt; the overall strength of the prosecution's case is but one factor in our harmless-error analysis." *Id.*

{27} In light of the principles outlined in *Johnson,* we must examine the trial record in order to determine whether the erroneous admission of codefendants' testimony was harmless beyond a reasonable doubt with respect to each of Defendant's convictions. *See Johnson,* 2004–NMSC–029, ¶ 31. " 'Because our harmless-error analysis instructs that error may be prejudicial with respect to one conviction, but harmless with respect to another, we review the effect of [codefen-

dant's] statement with respect to each conviction separately.' " *Lopez*, 2007–NMSC–037, ¶ 24 (quoting *Johnson*, 2004–NMSC–029, ¶ 31).

### I. Intentional Child Abuse Resulting in Death or Great Bodily Harm

{28} The charge of intentional child abuse resulting in death or great bodily harm pertains to the injuries inflicted on Baby Briana in the last two days of her life. "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health; (2) tortured, cruelly confined or cruelly punished...." Section 30–6–1(D). In order to obtain a conviction under the theory of intentional child abuse, the State was required to prove beyond a reasonable doubt that (1) Defendant caused Baby Briana to be placed in a situation which endangered her life or health, or tortured or cruelly confined or punished Baby Briana; (2) Defendant acted intentionally; and (3) Defendant's actions resulted in the death of or great bodily harm to Baby Briana. *See* UJI 14–602 NMRA (defining the elements of intentional child abuse resulting in great bodily harm).

{29} The statements of the codefendants regarding Defendant's actions during the last two days of Baby Briana's life must be examined to determine if the admission of those statements may be characterized as harmless. The relevant statements are as follows. Mother said that Defendant and Uncle remained awake after she fell asleep on the night of July 18, 2002. Mother described the actions Defendant took to care for Baby Briana that night. Mother said that she did not witness Defendant or Uncle doing anything to harm Baby Briana; however, Mother stated that when she asked Defendant the next morning how Baby Briana was injured, Defendant said he threw her up in the air once, and maybe Uncle threw her in the air once.

{30} Uncle also described Defendant's behavior the night before Baby Briana's death. Uncle stated that Defendant was drinking beer and that he and Defendant were playing video games in the bedroom. Uncle told police that Defendant was throwing Baby Briana into the air and that she hit her head on the ceiling twice. Uncle confirmed that both he and Defendant were throwing Baby Briana into the air so that she hit her head on the ceiling and fell to the floor.

{31} Defendant's own statement to police is consistent with the testimonial statements of his codefendants. Defendant told police that on the night of July 18, 2002, he threw Baby Briana in the air such that her head hit the ceiling three times. Defendant also admitted that on the night before Baby Briana's death, he and Uncle were "playing rough" with her. Defendant again admitted to throwing her into the air so that she hit the ceiling and then allowed her to drop to the floor when he "missed" her. Defendant identified particular bruises on a photograph of Baby Briana as being caused by her hitting the ceiling, and other bruises that were a result of instances when she landed on the floor. Defendant told police that Baby Briana cried when she was dropped on the floor, and when he was asked what he did to calm her down, Defendant answered, "I just kept throwing her in the air." Additionally, Defendant identified various bite marks on Baby Briana's body that he acknowledged he made.

{32} Applying the first of the harmlesserror factors articulated in *Johnson*, the importance of the statements in the prosecution's case, to the codefendants' statements, it is clear that in many cases eyewitness testimony describing a defendant's participation in child abuse would be tremendously important to the prosecution's case. However, in this case, the testimonial statements of Mother and Uncle are redundant in light of Defendant's confession. In his own statement to police, Defendant established each of the elements of intentional child abuse. Defendant confessed to torturing Baby Briana on the night of July 18, 2002, by repeatedly throwing her into the air so that her head hit the ceiling and allowing her to fall to the floor. Defendant also identified injuries that were caused by his repeated act of throwing Baby Briana to the ceiling and her landing on the floor. Defendant's statement to police describing his own behavior was more com-

plete and detailed than either of his codefendants' statements. Because Mother's and Uncle's statements did not provide any additional factual information that was not already contained within Defendant's own statement, we conclude that the statements were cumulative, the second factor listed in *Johnson*. *See Johnson*, 2004–NMSC–029, ¶ 38 (stating "[c]umulative evidence is additional evidence of the same kind tending to prove the same point as other evidence already given"). Additionally, considering the third *Johnson* factor, the presence or absence of evidence corroborating or contradicting the testimony of the witnesses on material points, the physical evidence of Baby Briana's injuries serves to corroborate Defendant's statements as well as the statements of Mother and Uncle. With regard to the fourth *Johnson* factor, the extent of other cross-examination, it is undisputed that Defendant had no opportunity to cross-examine his codefendants. However, the overall strength of the prosecution's case cannot be ignored. Defendant made a detailed confession to police which was fully corroborated by the evidence of injuries. Upon weighing all of the *Johnson* factors, we hold that the trial court's admission of Mother's and Uncle's statements was harmless beyond a reasonable doubt with regard to Defendant's conviction of intentional child abuse resulting in death or great bodily harm.

## II. Criminal Sexual Penetration of a Child Under Thirteen in the First Degree

{33} "Criminal sexual penetration is the unlawful and intentional causing of a person to engage in sexual intercourse, cunnilingus, fellatio or anal intercourse or the causing of penetration, to any extent and with any object, of the genital or anal openings of another, whether or not there is any emission." Section 30–9–11(A). All sexual penetration perpetrated on a child under thirteen years of age is criminal sexual penetration in the first degree. Section 30–9–11(C). The State was required to prove, in relevant part, that (1) Defendant caused the insertion, to any extent, of his finger into the anus of Baby Briana; (2) Baby Briana was twelve years of age or younger; and (3)

Defendant's act was unlawful. *See* UJI 14–957 NMRA (defining the elements of criminal sexual penetration of a child under thirteen years of age).

{34} The codefendants' statements are silent as to any conduct of Defendant that would have amounted to criminal sexual penetration. Aside from Defendant, the only person to remark about the injuries to Baby Briana's anus was Uncle. In his interview with police, Uncle was asked if Defendant sexually assaulted Baby Briana. Uncle said no, that Defendant was not responsible for her injury, and then Uncle proceeded to admit that he sexually penetrated Baby Briana. Defendant himself admitted to sexually penetrating Baby Briana. In his statement to police, Defendant stated that he inserted his index finger into Baby Briana's anus up to the second knuckle.

{35} Applying the *Johnson* factors to the codefendants' testimony relating to this charge, the codefendants' statements did not impute Defendant with regard to the charge of criminal sexual penetration and would not have aided the prosecution. Uncle stated explicitly that Defendant did not sexually assault Baby Briana, and Uncle claimed responsibility for her injury. Additionally, there was overwhelming evidence of Defendant's guilt in the form of his own confession and the DNA evidence linking Baby Briana's blood to Defendant. When this evidence is balanced against the negligible impact of the codefendants' statements, it is clear that the erroneous admission of the statements was harmless beyond a reasonable doubt with respect to this conviction. *See Johnson*, 2004–NMSC–029, ¶ 53 (holding that the erroneous admission of a testimonial statement was harmless beyond a reasonable doubt because the "statement did not serve to strengthen or corroborate the other evidence of guilt" when the statement was silent with respect to the elements of a particular charge).

## III. Intentional Child Abuse Not Resulting in Death or Great Bodily Harm

{36} The charge of intentional child abuse not resulting in death or great bodily

harm pertains to the injuries inflicted on Baby Briana prior to those injuries inflicted during the last days of Baby Briana's life which caused her death. "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health; (2) tortured, cruelly confined or cruelly punished. . . ." Section 30–6–1(D). Thus, the State was required to prove, in relevant part, that: (1) Defendant caused Baby Briana to be placed in a situation which endangered the life or health of Baby Briana or caused Baby Briana to be tortured or cruelly confined or cruelly punished; (2) Defendant acted intentionally; (3) Baby Briana was under the age of eighteen. *See* UJI 14–604 NMRA (defining the elements of intentional child abuse not resulting in great bodily harm).

{37} Both Mother's and Second Uncle's statements to police described Defendant's behavior prior to the last days of Baby Briana's life. Mother said that a couple of days before July 19, 2002, Defendant threw Baby Briana up in the air and that "she came down." Later during her custodial interview, Mother said that Defendant threw Baby Briana up in the air and that her head hit the ceiling. Mother said that in the month prior to Baby Briana's death, she told Defendant two or three times to stop throwing the baby. Additionally, Second Uncle implicated Defendant in his statement to police. Second Uncle said that a couple of days prior to Baby Briana's death, Grandmother had seen Defendant throw Baby Briana in the air and told him to stop. However, Defendant implicated himself with regard to the charge of child abuse not resulting in death or great bodily harm. Defendant told police that four days prior to Baby Briana's death, he threw her in the air and allowed her head to hit the ceiling. He also admitted that he was responsible for some of the bite marks on Baby Briana's body.

{38} In many cases, statements such as those made by Mother and Second Uncle would be extremely important to the prosecution's case. However, in this case, the codefendants' testimonial statements were merely cumulative of Defendant's confession. Defendant's confession provided sufficient evidence to establish each element of intentional child abuse not resulting in great bodily harm. *See Johnson*, 2004–NMSC–029, ¶ 39 (stating "cumulative evidence merely augments or tends to establish a point *already proved* by other evidence"). Additionally, the autopsy of Baby Briana revealed overwhelming evidence of injury that occurred prior to those injuries causing her death. Baby Briana suffered skull fractures five to seven days before her death. The membranes around her brain showed the presence of old blood, indicating that Baby Briana had received a brain injury in the past. Baby Briana's optical nerves contained old blood, meaning that she had been violently shaken in the past, and Baby Briana suffered two rib fractures on the right side of her chest several weeks before her death. While this physical evidence was consistent with the statements of Mother and Second Uncle, it also confirmed Defendant's confession. In light of this overwhelming physical evidence supporting Defendant's confession, and the fact that Mother and Second Uncle's statements were cumulative, we determine that the admission of these statements was harmless.

### IV. *Negligently Permitting Child Abuse Not Resulting in Death or Great Bodily Harm*

{39} The charge of negligently permitting child abuse not resulting in death or great bodily harm pertains to the injuries inflicted on Baby Briana prior to her death. "Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health; (2) tortured, cruelly confined or cruelly punished. . . ." Section 30–6–1(D). Under this theory, the State was required to prove, in relevant part, that (1) Defendant caused Baby Briana to be placed in a situation which endangered the life or health of Baby Briana, or caused Baby Briana to be tortured or cruelly confined, or cruelly punished; (2) Defendant acted with reckless disregard; (3) Baby Briana was under the age of eighteen.

*See* UJI 14–604 NMRA (defining the elements of negligently permitting child abuse not resulting in death or great bodily harm).

{40} The only statement made by a codefendant relating to this charge was made by Uncle. In his statement to police, Uncle said that sometimes he and Defendant would throw Baby Briana into the air. Defendant himself told police that sometimes Mother would get mad, and she would pinch Baby Briana's ears and throw her into her bouncer chair from a distance of about two feet.

{41} As with the previous charge, Defendant's statement to police established the elements of negligently permitting child abuse not resulting in death or great bodily harm. Again, in light of the overwhelming physical evidence of abuse in this case, we find that Uncle's statement was harmless beyond a reasonable doubt with regard to this charge.

## V. *Conspiracy to Commit Intentional Child Abuse*

{42} "Conspiracy consists of knowingly combining with another for the purpose of committing a felony within or without this state." Section 30–28–2. An overt act is not required, and the crime of conspiracy is complete when the felonious agreement is reached. *Johnson*, 2004–NMSC–029, ¶ 49 (citing *State v. Davis*, 92 N.M. 341, 344, 587 P.2d 1352, 1355 (Ct.App. 1978)). "Such an agreement need not be proven by direct evidence; the agreement may be in the form of a mutually implied understanding and may be inferred from circumstantial evidence." *Id.* To obtain a conviction under the theory of conspiracy, the State was required to prove beyond a reasonable doubt that (1) Defendant and Uncle by words or acts agreed together to commit intentional child abuse resulting in death or great bodily harm; and (2) Defendant and Uncle intended to commit child abuse resulting in death or great bodily harm. *See* UJI 14–2810 NMRA (defining the elements of conspiracy).

{43} The statements of Defendant's codefendants did not provide direct evidentiary support for the State's theory that Defendant "knowingly combin[ed] with another for the purpose of committing [intentional child abuse resulting in great bodily harm]." Section 30–28–2. None of the codefendants told police about the existence of an agreement between Defendant and Uncle. However, the statements of both Mother and Uncle constituted circumstantial evidence from which the jury could have inferred that Defendant and Uncle agreed to commit intentional child abuse. In reference to the night of July 18, 2002, Mother said that Defendant told her "maybe [Uncle] threw the baby up," and Defendant told her that he threw Baby Briana up in the air once. In his statement, Uncle admitted that, on the night of July 18, 2002, he had thrown Baby Briana in the air so that she hit her head on the ceiling and that Defendant threw her in the air so she hit her head on the ceiling twice. Uncle later confirmed that Baby Briana hit her head on the ceiling and fell to the floor. As we discussed above, Defendant conveyed this same information in his statement to police. Defendant told police that he and Uncle threw Baby Briana into the air.

{44} We conclude that the statements of Mother and Uncle were important to the prosecution's conspiracy case. Mother's statement that Defendant told her "maybe [Uncle] threw the baby up," indicates that Defendant was aware of Uncle's actions and that they may have been working together. Additionally, Uncle's statement confirmed that Defendant and Uncle were acting in conjunction with one another. While Defendant also told police that Uncle was throwing Baby Briana in the air, the statements of Mother and Uncle are relevant because there is no direct evidence of conspiracy. Neither Defendant nor Uncle acknowledged that they had entered an agreement to commit child abuse, and conspiracy must be implied from the fact that both Defendant and Uncle participated in abusing Baby Briana. Thus, the admission of testimony from Defendant's alleged coconspirator was particularly damaging to Defendant. The prosecution's theory of conspiracy is not supported by physical evidence, and there is no other properly admitted corroborating testimony. Thus, in light of the factors listed in *Johnson*, we hold the admission of Mother's and Uncle's testi-

mony was not harmless beyond a reasonable doubt and his conviction as to this charge is reversed.

## CONCLUSION

{45} With regard to Defendant's convictions for intentional child abuse resulting in death or great bodily harm, criminal sexual penetration of a child under thirteen years of age in the first degree, intentional child abuse not resulting in death or great bodily harm, and negligently permitting child abuse not resulting in death or great bodily harm, we affirm Defendant's convictions, and we reverse the Court of Appeals' decision to overturn Defendant's convictions and remand for a separate trial. However, with regard to Defendant's conviction for conspiracy to commit intentional child abuse resulting in death or great bodily harm, we affirm the Court of Appeals' decision to reverse Defendant's conviction. Accordingly, we vacate the Defendant's conspiracy conviction and remand for a new trial in which Defendant may be retried on that count.

{46} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PATRICIO M. SERNA, and RICHARD C. BOSSON, Justices, and PAMELA B. MINZNER, Justice (not participating).